UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

JOHN W. RICHARDSON, III,

      Plaintiff,

    v.

OLD DOMINION UNIVERSITY and
JEFFREY JONES,

      Defendants.

Civil No. 2:23cv354

## ORDER

Pending before the Court are a Motion for Summary Judgment (the "Motion") (ECF No. 45) and a Memorandum in Support thereof (ECF No. 46) filed by Defendants Old Dominion University ("ODU") and Jeffrey Jones ("Coach Jones") (collectively, "Defendants") and a Motion for Partial Summary Judgment (the "Richardson Motion") (ECF No. 41) and a Memorandum in Support thereof (ECF No. 42) filed by Plaintiff John W. Richardson, III ("Coach Richardson" or "Plaintiff").[1] For the following reasons, the Motion (ECF No. 45) is **GRANTED**, and the Richardson Motion (ECF No. 41) is **DISMISSED as moot**.[2]

---

[1] The Court has determined that a hearing on the Motion and the Richardson Motion is unnecessary, as the issues for decision are adequately presented in the briefs. *See* E.D. Va. Local Civ. R. 7(J). Defendants' Request for a Hearing on the Motion (ECF No. 53) is therefore **DENIED**.

[2] Also pending before the Court is a Joint Motion to Amend Scheduling Order (the "Joint Motion"). Mot., ECF No. 57. As the instant Order directs the Clerk to close the above-captioned case, the Joint Motion (ECF No. 57) is **DISMISSED as moot**.

## I.   BACKGROUND

When adjudicating a motion for summary judgment, a court views the record as a whole and in the light most favorable to the non-moving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### A.   Undisputed Material Facts

ODU is a public research university in Norfolk, Virginia. Am. Compl. ¶ 10, ECF No. 22 ("Am. Compl."). Coach Richardson, who is African American, was an assistant basketball coach at ODU, in charge of recruiting, from 2008 to 2010 and from 2012 until September 1, 2022. Def. Mem. Supp. Mot. Summ. J. ¶ 1, ECF No. 46 ("Def. Mem. Supp.") (citing Am. Compl. ¶¶ 1, 12–14). Coach Jones, who is white, became Head Coach of ODU's men's basketball team in April 2013. *Id.* ¶ 2 (citing Am. Compl. ¶¶ 11, 15).

Coach Richardson brings this action alleging racial discrimination in violation of Title VII of the Civil Rights Act against ODU (Count 1), racial discrimination in violation of 42 U.S.C. § 1983 ("§1983") against ODU and Coach Jones (Count 2), fraudulent inducement under state law against ODU (Count 3), and breach of contract under state law against ODU (Count 4). Am. Compl. ¶¶ 40–73.

#### 1.   *Coach Jones is Hired as Head Coach at ODU and Retains Coach Richardson on His Staff*

When Coach Jones became the Head Coach at ODU in 2013, Coach Richardson was already working at ODU as an assistant basketball coach, and Coach Jones retained him on his coaching staff. Def. Mem. Supp ¶ 2 (citing Richardson Dep. at

83:04–09, ECF No. 58 ("Richardson Dep.")[3]; Def. Mem. Supp. Ex. 11 at 59:05–16, ECF No. 46-11 ("Jones Dep.")); *see also* Pl. Resp. Opp'n Mot. Summ. J. ¶ 2, ECF No. 47 ("Pl. Resp. Opp'n") (citing Brickman Decl. Ex. A at 59:05–16, ECF No. 48 ("Brickman Decl."); Richardson Decl. ¶ 4, ECF No. 49 ("Richardson Decl.")). Around the same time, Coach Jones hired Lamar Barrett and Bryant Stith ("Coach Stith"), who are both African American, as assistant coaches. Def. Mem. Supp. ¶ 3 (citing Jones Dep. at 60:10–18).

On July 8, 2014, Coach Richardson and ODU entered into an employment contract (the "Employment Contract"). *Id.* ¶ 4 (citing Def. Mem. Supp. Ex. 1, ECF No. 46-1). The Employment Contract provided that Coach Richardson's employment was "'at will' . . . and, as such, no cause is required by either party for termination hereof." *Id.* It further explained that Coach Richardson was "administrative and professional faculty (AP faculty)," subject to "the policies and procedures as described in the [ODU] Faculty Handbook," except that certain provisions, including "notice of non-renewal of contract[] or termination of employment," were not applicable to him. *Id.* As ODU's practice is not to issue annual appointment letters to employees, the Employment Contract is the operable agreement covering Coach Richardson's employment. *Id.* (citing Def. Mem. Supp. Ex. 7 at 25:07–27:08, ECF No. 46-7).

Every year after Coach Jones's arrival, Coach Richardson was the highest paid of the men's basketball assistant coaches by a substantial amount. *Id.* ¶ 5 (citing

---

[3] Any citation to Coach Richardson's deposition in the instant Order refers to the full deposition filed on January 20, 2026 at ECF No. 58.

Richardson Dep. at 84:04–10, 86:06–09; Jones Dep. at 115:16–17). Coach Richardson's primary role was recruiting players, although he did have other responsibilities. *Id.* ¶ 6 (citing Richardson Dep. at 264:01–266:02; Jones Dep. at 330:22–331:06); *see also* Pl. Resp. Opp'n ¶ 6 (citing Brickman Decl. Ex. D at 282:09–11). Coach Stith and other staff members thought that Coach Jones favored Coach Richardson by letting him get "away with a lot more things than . . . other coaches did on his staff." Def. Mem. Supp. ¶ 7 (citing Def. Mem. Supp. Ex. 8 at 128:23–25, ECF No. 46-8 ("Stith Dep."); Def. Mem. Supp. Ex. 6 at 45:19–46:06; 87:24–88:24; 91:23–92:03, ECF No. 46-6 ("Wolff Dep.")).

### 2. *Unwelcome Conduct at ODU*

Coach Richardson perceived "an undercoat" or "underbelly" of racism at ODU. *Id.* ¶ 34 (citing Richardson Dep. at 62:01–05). Coach Richardson points to "remarks that [were] made because of where [Coach Richardson] went to school." *Id.* (citing Richardson Dep. at 62:21–63:07). In his deposition, Coach Richardson testified, "I believe that there was always an . . . undertone with [Coach Jones] . . . to really hear him talk about certain coaches of color that may not have . . . had the same basketball cachet as him, I felt like that there was some racial undertone behind it." *Id.* ¶ 35 (citing Richardson Dep. at 70:07–17). Coach Richardson elaborated that by "cachet," he meant, "I didn't go to the University of Virginia. I didn't play in the NBA . . . I didn't score 22,000 points or anything like that. I was just maybe a self-made coach[.]" *Id.* (citing Richardson Dep. at 71:02–06). Coach Richardson felt that Coach Jones did not see him as equal to Coach Stith, who played on Coach Jones's team at the

University of Virginia when Coach Stith was a student and Coach Jones was head coach there. *Id.* ¶ 36 (citing Richardson Dep. at 168:16–22).

Furthermore, Coach Jones was an "old school" coach, who frequently yelled and cursed at players, using harsh language such as "dumb motherf[*]ckers." Def. Reply ¶ 35, ECF No. 52 (citing Def. Reply Ex. 5 at 134:11–135:06, ECF No. 52-5); Pl. Resp. Opp'n ¶ 37 (citing Brickman Decl. Ex. A at 114:06–12; Brickman Decl. Ex. B at 66:06–24; Richardson Dep. at 245:04–07; 274:06–16; Brickman Decl. Ex. H at 93:25–94:15; Brickman Decl. Ex. J at 67:09–12; Brickman Decl. Ex. K; Richardson Decl. ¶ 12). During the timeframe relevant to this case, 90 percent of the ODU basketball players were African American. Def. Reply ¶ 35, ECF No. 52 (citing Richardson Dep. at 274:20–278:17). However, Coach Jones did not direct verbal abuse at Coach Richardson. Def. Mem. Supp. ¶ 38 (citing Richardson Dep. at 286:15–22; 295:12–18; 296:09–10).

At the end of the 2013–2014 season, Coach Jones likened Coach Richardson's communications with players to that of a "Black Southern Preacher." Pl. Resp. Opp'n ¶ B (citing Richardson Dep. at 199:10–201:04; Richardson Decl. ¶ 6). A couple years later, in or about April 2016, Coach Jones hosted a Final Four Dinner; at the dinner, Jena Virga ("Ms. Virga"), a white woman who served as the Executive Director of the Old Dominion Athletic Foundation, said "f[*]ck you" to Coach Richardson in response to his joke criticizing her for supporting football at the expense of basketball. *Id.* ¶ C (citing Richardson Dep. at 202:18–204:25; Richardson Decl. ¶ 12); Def. Reply ¶ C, ECF No. 52.

In or about March 2017, Murray Garvin ("Coach Garvin"), an African American man and the South Carolina State Head Basketball Coach, brought to Coach Richardson's attention a heated and accusatory e-mail exchange that Coach Garvin had with Special Assistant to the Head Coach Kieran Donohue ("Mr. Donohue"), which Coach Garvin reported to Coach Jones. Pl. Resp. Opp'n ¶ E (citing Richardson Dep. at 207:21–208:25; 209:16–210:17; Richardson Decl. ¶ 13). Mr. Donohue kept his job after this incident. *Id.* ¶ F (citing Richardson Dep. at 214:23–25).

In August 2020, Coach Jones insisted that Coach Richardson and Coach Stith, the two African American assistant coaches on his staff, attend a two-day race/diversity seminar called "A Long Conversation." *Id.* ¶ G (citing Richardson Dep. at 212:19–213:22; Richardson Decl. ¶ 16). By contrast, the Caucasian assistants were not required to, and did not, attend this seminar, without consequence. *Id.* ¶ H (citing Richardson Decl. ¶ 16).

Around October 2020, ODU ordered "Equality" warm-up t-shirts, but Wood Selig ("Mr. Selig"), ODU's Athletic Director, told the players that the t-shirts could only be worn before fans entered the arena due to concerns that they would offend major donors. *Id.* ¶ J (citing Richardson Dep. at 218:20–219:11); *see also* Def. Mem. Supp. ¶ 25 (stating that Mr. Selig was the ODU Athletic Director).

Around October 2021, in response to Coach Richardson laughing at a skit performed by several Black athletes, Chris Kovensky ("Coach Kovensky"), who was also an ODU Assistant Coach, said to an ODU Women's Basketball Assistant Coach,

"Look at [Coach Richardson]. What does he think this is, the CIAA?"[4] Pl. Resp. Opp'n ¶ K (citing Brickman Decl. Ex. B at 90:14–19; Richardson Dep. at 224:24–225:23; Richardson Decl. ¶ 14); *see also* Richardson Dep. at 118:03–119:08 (stating that Coach Kovensky was an assistant coach as of the 2019–2020 season). Also, during the 2021–2022 season, a movie was shown about slavery on the bus with no context or discussion before or after the showing of the movie, and the movie offended Coach Richardson. Pl. Resp. Opp'n ¶ L (citing Brickman Decl. Ex. D at 338:13–340:01; Richardson Decl. ¶ 18).

ODU offered "some" training on discrimination and harassment. *Id.* ¶ O (citing Brickman Decl. Ex. A at 340:20– 23, Richardson Dep. at 170:13–25). In or about September 2021, ODU engaged Tom Perrin ("Dr. Perrin"), a sports psychologist, as a consultant to interview the men's basketball staff to see how their personal interactions and the staff's dynamic could be improved. Def. Mem. Supp. ¶ 8 (citing Am. Compl. ¶ 25). Coach Richardson could not recall whether he told Dr. Perrin that he believed there was racial discrimination at ODU. Pl. Resp. Opp'n ¶ 8 (citing Richardson Dep. at 384:12–17).

At some point in time, Coach Kovensky stated that Coach Richardson could better relate to and recruit Black student athletes because Coach Richardson had experiences that allowed him to connect to young men that had gone through things Coach Kovensky had not, and that Coach Kovensky couldn't speak to. *Id.* ¶ 6 (citing

---

[4] "The CIAA is an athletic conference comprised of historically black colleges and universities ("HBCU[s]") and is the conference in which [Coach Richardson] played basketball." Richardson Decl. ¶ 14.

Brickman Decl. Ex. B at 8:05–9:13).[5] Coach Kovensky believed this allowed Coach Richardson to connect better with players "of that type." *Id.* (citing Brickman Decl. Ex. B at 8:05–9:13).

Until the termination of his employment, Coach Richardson felt that his "relationship with Coach Jones was solid. I wouldn't say good, but I, you know . . . [t]here was nothing that I wouldn't do for that man." Def. Mem. Supp. ¶ 39 (citing Richardson Dep. at 305:24–308:13). Coach Richardson stated that the only problem in their relationship was the termination. *Id.* (citing Richardson Dep. at 307:13–16). Coach Richardson never complained of racial discrimination or harassment to ODU's Human Resources Department. *Id.* ¶ 40 (citing Richardson Dep. at 170:09–18, 173:18–21).

### 3.    *Coach Richardson's Job Performance*

Coach Richardson was good at his job, received pay increases and accolades, and was described as enjoyable, hardworking, and pleasant to be around. Pl. Resp.

---

[5] Coach Richardson also cites his declaration to support the assertion that Coach Jones stated that "as a Black man, [Coach] Richardson could better relate to, and recruit, Black student athletes because he 'spoke their language.'" Pl. Mem. Opp'n ¶ 6 (citing Richardson Decl. ¶ 6). However, this assertion is not supported by either Coach Richardson's deposition or Coach Jones's deposition. Coach Richardson cannot rely solely on his own declaration where it contradicts prior deposition testimony. *See Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984) ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact. A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.") (internal quotations and citations omitted). Therefore, the Court has omitted that assertion and relies only on undisputed facts supported by the record. The Court cites Coach Richardson's declaration herein only where it is supported by, or otherwise not contradicted by, deposition testimony or other evidence submitted to the Court.

Opp'n ¶ P (citing Richardson Decl. ¶ 9; Brickman Decl. Ex. A at 109:19–110:06; 111:21–25). Coach Richardson received an award as one of the Most Impactful Assistants in the Conference at least once. *Id.* ¶ Q (citing Brickman Decl. Exs. G–I, ECF No. 43; Richardson Decl. ¶ 9). Coach Richardson developed a network in the close-knit coaching community. *Id.* ¶ R (citing Brickman Decl. Ex. A at 192:21; Brickman Decl. Ex. D at 270:16–17).

Coach Jones knew about Coach Richardson's professional goal of becoming a Men's Head Basketball Coach from their first season together. *Id.* ¶ S (citing Brickman Decl. Ex. A at 95:05–17, 97:05–11; Richardson Dep. at 102:24–25; Brickman Decl. Ex. F. ¶ 2, ECF No. 43). Furthermore, Coach Richardson was never disciplined during his time at ODU. *Id.* ¶ T (citing Brickman Decl. Ex. A at 66:17–21; 244:12–25; Brickman Decl. Ex. L at 65:02–14; Richardson Decl. ¶ 9).

### 4. Coach Richardson's Treatment Compared to Other ODU Staff Members

By contrast to Coach Richardson's job performance, Coach Jones put Mr. Donohue on an Interpersonal Communications Professional Development Plan ("PIP") after the 2018–2019 season. *Id.* ¶ U (citing Brickman Decl. Ex. D). Coach Jones placed Mr. Donohue on this PIP because he found Mr. Donohue to be disrespectful and rude at times to colleagues in the athletic department and office and to Coach Garvin. *Id.* ¶ V (citing Brickman Decl. Ex. A at 66:02–16; Brickman Decl. Ex. M). This PIP indicated that Mr. Donohue's interactions had "been described as 'caustic', causing issues of avoidance by those with whom [he] interact[ed]." *Id.* ¶ W (citing Brickman Decl. Ex. D). Coach Kovensky indicated that everyone on the staff "with

9

the exception of […] [Coach] Stith" would "avoid dealing with Mr. Donohue at certain times because of his style." *Id.* ¶ X (citing Brickman Decl. Ex. B at 50:20– 51:09). Mr. Donohue was not terminated or disciplined for his behavior and currently serves as ODU's Assistant to the Athletic Director and Athletic Development Officer. *Id.* ¶ Y (citing Brickman Decl. Ex. I at 204:03–05). Additionally, Mr. Donohue had multiple meetings a year with Coach Jones with feedback about his performance. *Id.* ¶ AA (citing Brickman Decl. Ex. I at 94:18–22). By contrast, Coach Richardson did not receive constructive feedback on how to improve his performance or advance his career. *Id.* ¶ BB (citing Richardson Decl. ¶ 10).

After Coach Kovensky was terminated from ODU, Coach Jones and Mr. Selig helped him with his job search, as Coach Jones's connections could assist him in securing employment. *Id.* ¶ CC (citing Brickman Decl. Ex. B at 31:17–32:07). Coach Richardson was not offered any such assistance. *Id.* (citing Richardson Decl. ¶ 20). However, Defendants provided Coach Richardson with post-employment assistance by giving him 6 months of notice pay. Def. Reply ¶ CC, ECF No. 52 (citing Def. Mem. Supp. Ex. 4, ECF No. 46-4; Def. Mem. Supp. ¶ 31). Moreover, Coach Jones thought that Coach Richardson, along with Coach Stith, had a better chance than other staff members of finding other coaching jobs, whereas he thought that Mr. Donohue, Coach Kovensky, and Drew Lakey ("Mr. Lakey") "because of their relative inexperience . . . were stuck" and "weren't going to be able to . . . move." *Id.* (citing Jones Dep. at 255:18–256:17).

10

Dennis Wolff ("Mr. Wolff"), a veteran coach, indicated that he "mentored all the other assistants other than [Coach Richardson]." Pl. Resp. Opp'n ¶ DD (citing Brickman Decl. Ex. H at 52:04–06); *see also* Richardson Dep. at 114:13–19 (stating that Mr. Wolff was a veteran coach). Mr. Wolff, who was not a supervisor, believed that "[Coach Richardson] didn't have any interest in any mentoring from me." Def. Reply ¶ DD, ECF No. 52 (citing Def. Reply Ex. 3 at 51:10–15, ECF No. 52-3). Mr. Wolff mentored the other African American assistant coaches. *Id.* (citing Def. Reply Ex. 3 at 51:23–52:06, ECF No. 52-3).

### 5.      *The Myrtle Beach Tournament: November 2021*

In November 2021, the team played in a tournament at Myrtle Beach. Def. Mem. Supp. ¶ 9 (citing Am. Compl. ¶ 29). Unable to attend because of illness, Coach Jones designated Coach Stith to serve as interim head coach during the tournament. *Id.* Coach Jones made that decision at the last minute, notifying the coaching staff the night before the first game of the tournament. *Id.* (citing Stith Dep. at 70:10–14). Coach Richardson was "visibly upset" that Coach Jones had selected Coach Stith rather than him for this role. *Id.* ¶ 10 (citing Stith Dep. at 71:12–17; Am. Compl. ¶ 29). In Coach Richardson's words, "[i]t stung" that Coach Jones picked Coach Stith instead of him. *Id.* (citing Richardson Dep. at 137:21–25). Coach Richardson had assumed that "if anything were to happen . . . to [Coach Jones], that it would be an opportunity" for Coach Richardson. *Id.* (citing Richardson Dep. at 138:14–19). Coach Richardson "expressed [his] disappointment" to Coach Stith. *Id.* (citing Def. Mem. Supp. Ex. 2 at 1, ECF No. 46-2; Richardson Dep. at 175:22–176:18).

11

Coach Stith observed that Coach Richardson did not present a "unified front" with him during the Myrtle Beach tournament. *Id.* ¶ 11 (citing Stith Dep. at 74:15–75:18; 125:22–126:04). Coach Stith described Coach Richardson as "[m]opey, distant, [and] disengaged" during the tournament. *Id.* (citing Stith Dep. at 75:19–20). Coach Stith felt that Coach Richardson's attitude was particularly damaging because the team's top players had been recruited by Coach Richardson and thus were under his influence. *Id.* (citing Stith Dep. at 77:09–15). The basketball team did poorly in the Myrtle Beach tournament, losing by significant margins in three games. *Id.* ¶ 12 (citing Richardson Dep. at 135:01–03; Def. Mem. Supp. Ex. 2 at 4, ECF No. 46-2). The team's performance was "devastating." *Id.* (citing Richardson Dep. at 139:14–15).

Coach Richardson felt that he was blamed for the team's poor performance at Myrtle Beach and "like [he] was a villain, personally, among the staff" for that reason. *Id.* ¶ 13 (citing Richardson Dep. at 131:15–132:03). In his self-evaluation for the year of the Myrtle Beach tournament, Coach Richardson wrote that, "[i]t was a challenging year to come to the office every day and work with the coaches and our players with all the adverse conditions that our team faced each day. There is a breakdown in communication between the staff." *Id.* ¶ 14 (citing Richardson Dep. at 141:10–14; Def. Mem. Supp. Ex. 3 at 2, ECF No. 46-3). Coach Jones heard from others that Coach Richardson "did not support [Coach] Stith and did not comport himself in a way that was appropriate" during the Myrtle Beach tournament. *Id.* ¶ 15 (citing Jones Dep. at 240:02–08). Coach Jones told Coach Richardson that, based on what he had heard from others, Coach Richardson had been a "distraction" during the trip. *Id.* (citing

12

Am. Compl. ¶ 29; Jones Dep. at 241:14–22). Coach Richardson felt that Coach Jones blamed him for the Myrtle Beach fiasco. *Id.* (citing Richardson Dep. at 146:12–17; 148:09–16; 164:16–165:10). However, in his deposition, Coach Jones indicated additional reasons that the Myrtle Beach tournament went poorly, stating, "I mean, you know, we talked about the Indiana State, but, you know, that game, you know, look, it wasn't [Coach] Richardson's scouting report. The scouting report was fine. It wasn't that. It was a compilation of a lot of different things topped off by our best player being informed 15 minutes before the game that a member of his family had been killed. And it just got off to a bad start and it snowballed. And then after getting beat by 40, then the next game, we weren't able to, you know, we, it just was a horrible experience." Pl. Resp. Opp'n ¶ 15 (citing Brickman Decl. Ex. A at 328:11–22) (cleaned up).

### 6. Coach Jones Tells Coach Richardson and Coach Stith to Start Looking for Employment Elsewhere

In or about June 2022, Coach Jones told Coach Richardson and Coach Stith to start looking for other jobs because Coach Jones anticipated that his own employment with ODU would be ending soon. Def. Mem. Supp. ¶ 16 (citing Stith Dep. at 8:07–20; Richardson Dep. at 270:18–271:08; Jones Dep. at 256:01–22). Coach Jones gave this advice to Coach Richardson and Coach Stith, and not the rest of the coaching staff, because he felt that Coach Richardson and Coach Stith had the best chance of finding other coaching jobs. *Id.* (citing Jones Dep. at 256:05–17). Both Coach Richardson and Coach Stith lamented that Coach Jones did not tell them earlier to look for other employment. *Id.* ¶ 17 (citing Stith Dep. at 18:01–08). Coach Stith followed Coach

Jones's advice and looked for other employment. *Id.* ¶ 18 (citing Stith Dep. at 8:21–9:04; 10:12–11:04; Richardson Dep. at 271:17–19). Coach Richardson, however, did not heed Coach Jones's advice and opted instead to "stick it out the best that I could because of my family and because of my love for [ODU.]" *Id.* (citing Richardson Dep. at 271:24–272:09). Coach Richardson also indicated that "in that current state when I heard him say that, it [made me want] to fight harder for him because of what he had gone through." Pl. Resp. Opp'n ¶ 18 (citing Richardson Dep. at 271:10–13).

However, after Coach Jones advised Coach Richardson to seek employment elsewhere, Coach Jones nonetheless also told Coach Richardson and others that Coach Richardson would be "taken care of" and that he would be promoted to Associate Head Coach for the 2022–2023 season. *Id.* (citing Brickman Decl. Ex. A at 73:23–24; 78:03–79:11; 80:03–04; 80:18–81:04; Richardson Dep. at 185:20–24; 189:07–16; Richardson Decl. ¶¶ 2–4, ECF No. 44). Coach Richardson "was approaching a milestone in [his] career of 30 years where [he] could retire from the State of Virginia." *Id.* (citing Richardson Dep. at 271:24–272:01).

### 7.   *Coach Stith Resigns*

On or about July 1, 2022, Coach Stith resigned to accept an assistant coach position at UNC Greensboro. Def. Mem. Supp. ¶ 19 (citing Am. Compl. ¶ 30). Coach Stith took that job because, based on Coach Jones's June 2022 instruction that he should look for a new job, he "felt that [his] future at [ODU] was uncertain." *Id.* (citing Stith Dep. at 11:19–25). Coach Stith also left ODU because "my relationship and my opinion with [Coach] Richardson would never be the same after the Myrtle Beach

14

incident. I felt that the trust had been broken and I didn't think that . . . [it] could be repaired." *Id.* (citing Stith Dep. at 98:04–08). However, Coach Stith never told anyone other than his wife that he left ODU because of Coach Richardson. Pl. Resp. Opp'n ¶ 19 (citing Brickman Decl. Ex. F at 14:10–14; 97:22–98:06). Coach Stith also indicated that he left "because of the fact that I had been told that I would be the next head coach at [ODU], but I didn't believe that was happening because they would never put that in writing." *Id.* (citing Brickman Decl. Ex. F at 98:08–12).

Coach Jones called Coach Richardson on or about July 1, 2022, to notify him that Coach Stith had resigned. Def. Mem. Supp. ¶ 20 (citing Richardson Dep. at 185:13–17). Coach Jones "was very upset at the fact that [Coach Stith] was leaving." *Id.* (citing Richardson Dep. at 185:18–19). Coach Richardson asked him, "Well, Coach [Jones], what does this mean for me now?" *Id.* (citing Richardson Dep. at 185:18–21). Coach Jones was "pissed []off" with [Coach] Richardson's question because "I was telling him that [Coach] Stith was leaving, somebody that I love and valued and was very important to me personally and professionally . . . [a]nd [Coach Richardson] could not even wait for another conversation" to ask how Coach Stith's departure might benefit him. *Id.* (citing Jones Dep. at 78:03–14). Coach Jones responded to Coach Richardson that he planned to "reorganize and restructure the staff, but you will be taken care of." *Id.* (citing Richardson Dep. at 185:18–24).

### 8.    *Coach Jones Has Lunch with Mr. Wolff*

On August 5, 2022, Coach Jones had lunch with Mr. Wolff, a former member of the coaching staff who was retired. *Id.* ¶ 21 (citing Jones Dep. at 276:21–278:18).

15

At this lunch, Mr. Wolff said he "was dumbfounded [with] the way [Coach Jones had] treated [Coach Stith] . . . [Coach Jones] treated [Coach Stith, Coach Kovensky] and [the] rest of the guys one way and [Coach] Richardson another way . . . we got into a heavier conversation in regard to [Coach Stith's] leaving and [Coach Jones] ignoring . . . [Coach Richardson's] daily work habits." *Id.* (citing Wolff Dep. at 87:22–88:08). At the lunch, Mr. Wolff also told Coach Jones that Coach Richardson's girlfriend had posted pictures of her with Coach Richardson during a basketball recruiting trip Coach Richardson had taken to Greece in 2019. *Id.* ¶ 22 (citing Jones Dep. at 278:14–18). That was the first Coach Jones had heard that Coach Richardson took his girlfriend on that recruiting trip. *Id.* Coach Jones was upset, not because Coach Richardson took his girlfriend, but because he had not told Coach Jones that he was doing so, stating it was a breach of trust. *Id.* (citing Jones Dep. at 278:24–279:19). However, it was not abnormal for coaches' wives, significant others, and family members to sometimes travel with the team and go on recruiting trips. Pl. Resp. Opp'n ¶ 23 (citing Brickman. Decl. Ex. I at 186:09–16). If Coach Richardson had asked Coach Jones, Coach Jones would have allowed Coach Richardson to take his girlfriend on the Greece trip. *Id.* (citing Brickman Decl. Ex. A at 278:24–279:19).

During that same lunch, Coach Jones came to understand that Mr. Wolff retired "at least in part" because he did not want to deal with Coach Richardson anymore. Def. Mem. Supp. ¶ 23 (citing Jones Dep. at 339:10–14). Coach Jones also came to understand that Mr. Wolff believed Coach Stith left because of Coach Richardson. *Id.* (citing Jones Dep. at 277:05–14). However, Mr. Wolff also stated that Coach Stith

16

left because Coach Stith did not see a path forward to become the coach, because he was no longer the coach in waiting, and he "did not like the dynamic of everything that was going on in the office, now specifically in regard to [Coach Richardson]." Pl. Resp. Opp'n ¶ 23 (citing Brickman. Decl. Ex. H at 109:08–18). Mr. Wolff also affirmed that Coach Stith left because Coach Jones told Coach Stith to look for another job. *Id.* (citing Brickman. Decl. Ex. H at 109:20–23). Following his lunch with Mr. Wolff, Coach Jones suspected that Coach Stith left ODU because of Coach Richardson. Def. Mem. Supp. ¶ 24 (citing Jones Dep. at 211:23–212:04).

### 9. *Coach Jones Wrestles with Whether to Fire or Promote Coach Richardson*

Sometime after his August 5, 2022 lunch with Mr. Wolff, Coach Jones conferred with Mr. Selig, ODU General Counsel Allen Wilson ("Mr. Wilson"), and Reverend Kevin Swann ("Reverend Swann"), a pastor who worked with the basketball team, about whether to terminate Coach Richardson's employment. *Id.* ¶ 25 (citing Jones Dep. at 334:16–335:09). Between August 5 and August 25, 2022, Coach Jones was wrestling with what to do about Coach Richardson—whether to give him the Associate Head Coach title, do nothing, or terminate his employment. Def. Reply ¶ 30, ECF No. 52 (citing Def. Resp. Opp'n Pl. Mot. Summ. J. ¶ 44, ECF No. 50 (citing Def. Resp. Opp'n Pl. Mot. Summ. J. Ex. 4 at 334:16–336:02, ECF No. 50-4)). During that period, Coach Jones met with Mr. Selig and Reverend Swann, who prayed with Coach Jones about what to do. *Id.* (citing Def. Resp. Opp'n Pl. Mot. Summ. J. ¶ 44, ECF No. 50 (citing Def. Resp. Opp'n Pl. Mot. Summ. J. Ex. 4 at 79:21–80:80, ECF No. 50-4)). Coach Jones was "hesitant to do what [Coach Jones] probably should have done

17

earlier." *Id.* (citing Def. Resp. Opp'n Pl. Mot. Summ. J. ¶ 44, ECF No. 50 (citing Def. Resp. Opp'n Pl. Mot. Summ. J. Ex. 4 at 224:18–24, ECF No. 50-4)); *see also* Def. Resp. Opp'n Pl. Mot. Summ. J. Ex. 8 at 13:20–14:20, ECF No. 50-8. However, after the August 5, 2022 lunch and for some time thereafter, Coach Jones continued to tell people, including Coach Richardson, that he was going to promote Coach Richardson to Associate Head Coach. Pl. Resp. Opp'n ¶ 23 (citing Brickman Decl. Ex. A at 80:18–25; 224:10–16; 280:01–282:09; 334:16–335:17; 357:15–19). Receiving the position of Associate Head Coach would have been a promotion for Coach Richardson. *Id.* ¶ MM (citing Brickman Decl. Ex. I at 64:04–25; 65:09– 22; 66:19–67:14; Brickman Decl. Ex. J at 13:19–22).

### 10.   *Hiring Decisions on August 22, 2022*

On August 22, 2022, Coach Jones hired Jordan Brooks ("Mr. Brooks"), who is African American, to the position of Director of Recruiting for the men's basketball team. Def. Mem. Supp. ¶ 26 (citing Am. Compl. ¶ 3; Richardson Dep. at 192:05–09). This was a new position that ODU had not had before. *Id.* (citing Richardson Dep. at 192:10–13). Coach Richardson previously, unofficially, served as recruiting coordinator. Pl. Resp. Opp'n ¶ 26 (citing Brickman Decl. Ex. J at 140:03–04). Coach Richardson never received an official title in recognition of his recruiting efforts. *Id.* (citing Richardson Decl. ¶ 11). Up until that point, Coach Richardson "had done the heavy lifting of recruiting[.]" Def. Mem. Supp. ¶ 26 (citing Richardson Dep. at 192:14–17; Jones Dep. at 115:18–19). Coach Richardson felt that Mr. Brooks "was brought in essentially to replace [him] to go get players." *Id.* (citing Richardson Dep. at 259:07–

18

09). Also on August 22, 2022, Coach Richardson asked Coach Jones about Mr. Brooks's title of Director of Recruiting given that he had been the lead recruiter to that point. *Id.* ¶ 27 (citing Jones Dep. at 273:14–274:01). Coach Jones responded that he would make Coach Richardson Associate Head Coach. *Id.* (citing Richardson Dep. at 324:11–325:09; Jones Dep. at 273:21–22). Coach Jones told Coach Richardson on August 22, 2022, that he would make him Associate Head Coach because that was Coach Jones's plan at that time. *Id.* ¶ 28 (citing Jones Dep. at 275:20–25; 358:25–359:06). Also in August 2022, Coach Jones hired Jamal Robinson ("Coach Robinson"), who is African American, as an assistant coach. *Id.* ¶ 29 (citing Jones Dep. at 127:05–15).

### 11.    *Coach Jones Fires Coach Richardson*

Coach Jones decided on or about August 25, 2022, to terminate Coach Richardson's employment. *Id.* ¶ 30 (citing Jones. Dep. at 296:17–20).[6] The ODU Men's Basketball Roster for the 2022–2023 season was still incomplete due to a lack of post players that would be filled by two of Coach Richardson's recruits. Pl. Resp. Opp'n ¶ NN (citing Brickman Decl. Ex. A at 269:07–14; Richardson Dep. at 387:13–17; Brickman Decl. Ex. F at 112:12–18). Coach Jones terminated Coach Richardson one

---

[6] Plaintiff refutes this decision date extensively. Pl. Resp. Opp'n ¶ 30. However, all citations provided by Plaintiff in support of Paragraph 30 indicate that Coach Jones was exploring his options regarding whether or not to terminate Coach Richardson prior to August 25, 2022, but that he did not make his final decision until the day before the Boo Williams event, which occurred on August 26, 2022. *See* Brickman Decl. Ex. A at 309:20–23; 334:16–335:09; 357:15–19; Brickman Decl. Ex. J at 141:11–21; 142:06–18; 157:09–19.

19

day after these two recruits were locked in. *Id.* ¶ PP (citing Pl. Mem. Supp. Mot. Partial Summ. J. ¶ 67, ECF No. 42 (citing Richardson Dep. at 390:15–18)).

On September 1, 2022, Coach Jones notified Coach Richardson that his employment would be terminated effective March 3, 2023. Def. Mem. Supp. ¶ 31 (citing Am. Compl. ¶¶ 1, 37; Def. Mem. Supp. Ex. 4, ECF No. 46-4). When Coach Jones terminated Coach Richardson's employment on September 1, 2022, he gave no reason for Coach Richardson's termination. Pl. Resp. Opp'n ¶ QQ (citing Brickman Decl. Ex. A at 299:18–23; Richardson Dep. at 308:08–10). Coach Jones knew it was late in the season and hiring cycle to terminate Coach Richardson's employment. *Id.* ¶ RR (citing Brickman Decl. Ex. I at 14:13–20).

Coach Richardson's termination letter indicates that "the needs and direction of our department require different talents.*" Id.* ¶ GG (citing Def. Mem. Supp. Ex. 4, ECF No. 46-4). However, when asked what talents the department required, Coach Jones replied, "I don't know. I'm – I'm not sure." *Id.* ¶ HH (citing Brickman Decl. Ex. A at 298:15–25). By contrast, in response to the Equal Employment Opportunity Commission Charge of Discrimination, ODU indicated that additional information, including allegations that Coach Stith stated he left because of Coach Richardson and performance-based allegations, constituted the reasons for Coach Richardson's termination. *Id.* ¶ II (citing Brickman Decl. Ex. N). Coach Stith denied sharing with Coach Jones or anyone else associated with the ODU Men's Basketball team that he left because of Coach Richardson. *Id.* (citing Brickman Decl. Ex. F at 14:10–14; 97:22–98:14). However, Coach Stith testified in his deposition that Coach Richardson was

20

one of the reasons he quit ODU. Def. Reply ¶ II, ECF No. 52. (citing Stith Dep. at 98:04–08). In response to Plaintiff's interrogatories, Defendants indicated two reasons for Coach Richardson's termination: 1) photographs posted by a woman who went to Greece with Plaintiff in 2019; and 2) "[Coach] Stith resigned because he no longer wanted to work with [Coach] Richardson or be associated with [Coach] Richardson . . . [Coach ] Jones called [Coach] Stith who confirmed [Mr.] Wolf[f]'s statements." Pl. Resp. Opp'n ¶ JJ (citing Brickman Decl. Ex. O at 9). Though Coach Stith did leave ODU in part because "[his] relationship and [his] opinion with [Coach] Richardson would never be the same after the Myrtle Beach incident," Coach Stith never told anyone that this one was of his reasons for leaving ODU, until the instant litigation. *Id.* ¶ KK (citing Brickman Decl. Ex. F at 14:10–14; 97:22–98:14); *see also* Stith Dep. at 97:22–98:14. Defendants have stated that "[Coach] Jones's loss of trust in [Coach] Richardson following [Coach] Stith's resignation and [Coach Jones's] discussion with [Coach] Wolff" was the reason for Coach Richardson's termination. Pl. Resp. Opp'n ¶ LL (citing Def. Mem. Supp. at 13).

Coach Jones was concerned that it might be difficult for Coach Richardson to find employment in the fall because it is easier to find a coaching position in March, when the basketball season ends. Def. Mem. Supp. ¶ 31 (citing Jones Dep. at 311:01–10). For that reason, ODU paid Coach Richardson six months of notice pay, rather than the usual two months provided to employees in his position, continuing his salary through March 3, 2023. *Id.* (citing Jones. Dep. at 311:01–10; Def. Mem. Supp. Ex. 9 at 177:16–178:12, ECF No. 46-9; Richardson Dep. at 349:17–350:11; Def. Mem.

21

Supp. Ex. 4, ECF No. 46-4). Coach Richardson did not perform any work for ODU after September 1, 2022. *Id.* (citing Richardson Dep. at 350:02–11). Coach Jones did not name anyone else to be associate head coach. *Id.* ¶ 33 (citing Def. Mem. Supp. Ex. 12 ¶ 3, ECF No. 46-12). On February 21, 2023, more than five months after his duties for ODU ceased, Coach Richardson made a request to ODU for FMLA leave. *Id.* ¶ 41 (citing Def Mem. Supp. Ex. 5, ECF No. 46-5). ODU denied the request. *Id.* (citing Am. Compl. ¶ 71; Richardson Dep. at 376:12–14).

## B.    Procedural History

On April 25, 2024, Coach Richardson filed an Amended Complaint alleging racial discrimination, fraudulent inducement, and breach of contract against ODU and Coach Jones. *See generally* Am. Compl. Specifically, Coach Richardson alleges racial discrimination pursuant to Title VII against ODU (Count 1); racial discrimination pursuant to 42 U.S.C. § 1983 against ODU and Coach Jones (Count 2); fraudulent inducement against ODU (Count 3); and breach of contract against ODU (Count 4). *Id.* ¶¶ 40–73. On May 9, 2024, Defendants filed their answer to the Amended Complaint. Answer, ECF No. 23.

On July 14, 2025, Coach Richardson filed the Richardson Motion (ECF No. 41) and a Memorandum in Support thereof (ECF No. 42), requesting that this Court grant partial summary judgment in favor of Coach Richardson for his fraudulent inducement claim against ODU (Count 3). *See* Pl. Mem. Supp. Mot. Partial Summ. J. at 5, ECF No. 42. On July 28, 2025, Defendants filed their response in opposition to the Richardson Motion. Def. Resp. Opp'n, ECF No. 50. On August 4, 2025, Coach

22

Richardson filed his reply. Reply, ECF No. 51. The Richardson Motion is ripe for adjudication.

On July 14, 2025, Defendants filed the instant Motion (ECF No. 45) and a Memorandum in Support thereof (ECF No. 46), requesting that this Court grant summary judgment in favor of Defendants as to all four counts alleged in the Amended Complaint. *See generally* Def. Mem. Supp. On July 28, 2025, Coach Richardson filed his response in opposition to the Motion. Pl. Resp. Opp'n. On August 4, 2025, Defendants filed their reply. Reply, ECF No. 52. The Motion is ripe for adjudication.

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court must grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). "A material fact is one 'that might affect the outcome of the suit under the governing law.' A disputed fact presents a genuine issue 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party seeking summary judgment bears the initial burden of establishing the basis of its motion and identifying materials in the record that demonstrate the absence of a genuine dispute of material fact. Fed. R. Civ. P. 56(c); *Celotex Corp.*, 477 U.S. at 322–25. When the moving party meets its burden, the burden shifts to the nonmoving party to present specific facts demonstrating that there is a genuine issue

of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). The nonmoving party must present more than a scintilla of evidence in its favor. *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 818 (4th Cir. 1995).

If "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal quotation marks and citation omitted). "[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). However, a court should discredit the nonmoving party's version of events where it is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also XVP Sports, LLC v. Bangs*, No. 2:11cv379, 2012 WL 4329258, at *4 (E.D. Va. Sept. 17, 2012) ("[W]hen ruling on a summary judgment motion, a court may also give credence to other facts supporting the movant, regardless of their source, if such facts are not challenged by the non-moving party because a failure to challenge proffered facts may render such facts 'admitted.'") (citations omitted).

## III.   ANALYSIS

### A.   Federal Law Claims: Racial Discrimination in Violation of Title VII and § 1983 against ODU and Coach Jones (Counts 1 and 2)

Title VII prohibits employment discrimination on the basis of race, religion, national origin, color, or sex, and applies to private and public sector employers with fifteen or more employers. 42 U.S.C. § 2000e, *et seq*. "A state employee may [also]

24

bring a Fourteenth Amendment challenge under 42 U.S.C. § 1983 to discriminatory employment decisions." *Holder v. City of Raleigh*, 867 F.2d 823, 828 (4th Cir. 1989). Title VII claims and § 1983 claims share the same substantive analysis. *Supinger v. Virginia*, 259 F. Supp. 3d 419, 433 (W.D. Va. 2017); *see also Holiday v. New Hanover Cnty. Registrar of Deeds*, 317 F. App'x 344, 345 (4th Cir. 2009) (enumerating the same prima facie elements for discriminatory termination pursuant to Title VII and § 1983). Therefore, the Court will consider Count 1, alleging race discrimination under Title VII, and Count 2, alleging race discrimination under Title VII and § 1983, in tandem.

Coach Richardson alleges that Defendants discriminated against him because of his race "by failing to promote him, by terminating him, and, before terminating him, by subjecting him to a hostile work environment, and subjecting him to disparate discipline and scrutiny and treating him differently, and less favorably, than the Caucasian assistant basketball coaches." Am. Compl. ¶ 43. The Court considers each alleged act of racial discrimination—(1) failure to promote; (2) termination; (3) hostile work environment; and (4) disparate impact—in turn.

### 1.  *Failure to Promote*

"In order to establish a prima facie claim of a discriminatory failure to promote under Title VII [and § 1983], a plaintiff must show that: (1) [he] is a member of a protected group, (2) there was a specific position for which [he] applied, (3) [he] was qualified for that position, and (4) [his employer] rejected [his] application under

25

circumstances that give rise to an inference of discrimination." *McCaskey v. Henry*, 461 F. App'x 268, 269–270 (4th Cir. 2012) (citation and internal quotation marks omitted).

Here, the first three prongs are undisputed. Coach Richardson is an African American man and is therefore a member of a protected group. Def. Mem. Supp. ¶ 1. The parties do not dispute the second and third elements—Coach Richardson was being considered for the specific position of Associate Head Coach, suggesting that Coach Jones deemed him qualified for such position. *Id.* ¶ 28.

As to the fourth prong, the Fourth Circuit has found that an employer rejects an applicant under circumstances giving rise to an inference of discrimination where "the evidence showed that after plaintiff was denied promotion, the positions thereafter remained open and were in fact filled by the employer from other applicants possessing his general qualifications." *Holmes v. Bevilacqua*, 774 F.2d 636, 640 (4th Cir. 1985) (citation and internal quotations marks omitted). Here, Coach Jones declined to promote Coach Richardson to Associate Head Coach in late August 2022 when he instead decided to fire Coach Richardson. Def. Mem. Supp. ¶ 30. However, Coach Richardson has not proven his prima facie case because he has not shown that the position remained open and was later filled by ODU from other applicants possessing his general qualifications. The only evidence before the Court is that "[d]uring his time as head coach, [Coach] Jones did not give anyone the title of Associate Head Coach." Def. Mem. Supp. Ex. 12 ¶ 3, ECF No. 46-12. Coach Richardson presents no additional evidence that ODU continued to seek out an Associate Head Coach after

26

ODU declining to promote him, nor does he address the failure to promote claim in his response in opposition to the instant Motion. *See generally* Pl. Resp. Opp'n. Coach Richardson also fails to provide any authority in which a court found that declining to promote a plaintiff—while also declining to hire for that position all together—gave rise to an inference of discrimination. For the foregoing reasons, no reasonable juror could conclude that ODU failed to promote Coach Richardson based upon his race.

### 2. *Termination*

To prevail on a Title VII or § 1983 claim that a plaintiff was terminated on the basis of race, a plaintiff must show that "(1) he belongs to a protected class; (2) he suffered an adverse employment action; (3) at the time of the adverse action, he was performing his job at a level that met employer's legitimate expectations; and (4) the [termination] occurred under circumstances giving rise to an inference of unlawful discrimination." *Jones v. Constellation Energy Projects & Servs. Grp., Inc.*, 629 F. App'x 466, 468 (4th Cir. 2015) (citation and internal quotation marks omitted).

As stated *supra*, the first prong is undisputed. Coach Richardson easily satisfies the second prong: he was terminated from his role as assistant coach by ODU. Def. Mem. Supp. ¶ 30. Termination is an adverse employment action. *See Jones*, 629 F. App'x at 469 ("[T]ermination qualifies as an adverse employment action.").[7]

---

[7] With respect to the third prong, there is some dispute as to whether Coach Richardson was performing his job at a level that met ODU's legitimate expectations at the time of his termination. The undisputed material facts indicate that, shortly before Coach Richardson's termination, Coach Jones was considering promoting Coach Richardson to the position of Associate Head Coach, which would tend to indicate

27

With respect to the fourth prong, courts have found that when, following a plaintiff's termination, an open position is filled by applicants outside the protected class, such circumstances can give rise to an inference of discriminatory termination. "A claim of discriminatory termination requires a showing that the position remained open after the plaintiff's termination or was filled by an applicant outside of the protected class." *McCaskey*, 461 F. App'x at 270 (affirming the district court's dismissal of discriminatory termination claim because a member of the same protected class as the plaintiff was promoted into plaintiff's position after her termination).

Here, on August 22, 2022, Coach Jones hired Mr. Brooks, who is African American, to the position of Director of Recruiting for the men's basketball team. Def. Mem. Supp. ¶ 26. Coach Richardson felt that Mr. Brooks "was brought in essentially to replace [Coach Richardson] to go get players." *Id.* (citing Richardson Dep. at 259:07–09). Also in August 2022, Coach Jones hired Coach Robinson, who is African American, as an assistant coach. *Id.* ¶ 29. Coach Richardson was replaced by Mr. Brooks and Coach Robinson, who are both African American and therefore members of the same protected class as Coach Richardson. Therefore, pursuant to *McCaskey*, no

---

that Coach Richardson was meeting expectations. Def. Mem. Supp. ¶ 28. However, Coach Jones was also troubled by what he learned during his lunch with Mr. Wolff. *Id.* ¶¶ 21–24. At the lunch, Coach Jones learned that: (1) Coach Richardson had taken his girlfriend on a recruiting trip to Greece without informing Coach Jones; (2) Mr. Wolff had retired in part due to Coach Richardson; and (3) Mr. Wolff believed Coach Stith had left ODU because of Coach Richardson. *Id.* However, the Court need not get into the weeds of whether Coach Richardson was meeting expectations at the time of his termination, because Coach Richardson has not made out his prima facie case with respect to the fourth prong as discussed *infra*.

reasonable juror could find that Coach Richardson was terminated on the basis of his race.

### 3.    Hostile Work Environment

"A hostile work environment exists only when the workplace is so permeated with discriminatory intimidation, ridicule, and insult, that it would reasonably be perceived, and is perceived, as hostile or abusive." *Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 781 (4th Cir. 2023) (citation and internal quotation marks omitted). The Fourth Circuit uses a four-part test when analyzing claims of hostile work environments:

> [T]o prevail on a Title VII claim that a workplace is racially hostile, a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the plaintiff's . . . race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer.

*Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (internal quotation marks and citation omitted). "While the [unwelcome conduct] element is subjective, the rest of the test is made up of objective components based on a reasonable person standard." *Pueschel v. Peters*, 577 F.3d 558, 565 (4th Cir. 2009) (citation modified).

### a.    Unwelcome Conduct Highlighted by Coach Richardson

In his response in opposition to the instant Motion, Coach Richardson highlights 12 incidents of unwelcome conduct during his employment with ODU: (1) Coach Kovensky stated something to the effect of "Black Assistant Coaches are more

29

effective than white assistant coaches at recruiting black players," Pl. Resp. Opp'n at 26[8] (citing *id.* ¶ 6) ("Incident 1"); (2) Coach Richardson had "limitations on his non-recruiting duties that other assistant coaches did not have," *id.* (citing *id.* ¶ 6) ("Incident 2"); (3) Coach Jones likened Coach Richardson's communications with players to that of a "Black Southern Preacher," *id.* (citing *id.* ¶ B) ("Incident 3"); (4) in April 2016, Ms. Virga inappropriately said "f[*]ck you" to Coach Richardson, *id.* (citing *id.* ¶ C) ("Incident 4"); (5) Coach Jones required Coach Richardson and Coach Stith to attend a two-day race/diversity seminar, but white coaches were not required to attend, *id.* (citing *id.* ¶¶ G–H) ("Incident 5"); (6) ODU ordered Equality warm-up t-shirts, but Mr. Selig told the players that the t-shirts could only be worn before the fans entered the arena due to concerns that the shirts would offend major donors,[9] *id.* (citing *id.* ¶ J) ("Incident 6"); (7) in response to Coach Richardson laughing at a skit performed by Black athletes, Coach Kovensky said to an ODU Women's Basketball Assistant Coach, "Look at John. What does he think this is, the CIAA?" *id.* (citing *id.* ¶ K) ("Incident 7"); (8) Coach Jones excused Coach Kovensky's racially offensive behavior by saying, "he is a middle aged white man and he ain't going to change," *id.* (citing Richardson Decl. ¶ 13) ("Incident 8"); (9) during the 2021–2022 season, Coach

---

[8] This Order utilizes ECF-generated pagination.

[9] The record does not support the assertion that the Black Lives Matter shirts that Coach Jones ordered for the team were "only used to improve the quality of practice, rather than supporting the message behind the movement." Pl. Resp. Opp'n at 26 (citing Pl. Resp. Opp'n ¶ I). The deposition testimony suggests that that was Coach Richardson's perception of why the shirts were ordered, but the way in which Plaintiff has stated it in Plaintiff's response in opposition mischaracterizes what was actually stated in the deposition testimony.

Jones showed a movie about slavery on the bus with no context or discussion before or after the showing of the movie, *id.* (citing *id.* ¶ L) ("Incident 9"); (10) Coach Jones placed Mr. Donohue on a PIP because he found Mr. Donohue to be disrespectful and rude at times to colleagues in the athletic department and office and to Coach Garvin, *id.* (citing *id.* ¶ V) ("Incident 10"); (11) Coach Jones considered Mr. Donohue's children as a reason for him not to go recruit externally in the summer, but failed to give the same consideration to Coach Richardson, *id.* (citing *id.* ¶ Z) ("Incident 11"); and (12) Coach Jones used harsh language, including but not limited to, "dumb moth-erf[*]ckers," during games to the players, who were predominantly Black; however, this language was never directed to Coach Richardson, *id.* (citing *id.* ¶¶ 37–38) ("Incident 12").

> b. *Coach Richardson Fails to Demonstrate that Four of the Aforementioned Instances are Based on Race*

As an initial matter, Coach Richardson fails to demonstrate that four of the aforementioned incidents—Incidents 2, 4, 10, and 11—are "based on [his] race." *Boyer-Liberto*, 786 F.3d at 277. With respect to Incident 2, Coach Richardson states that he had "limitations on his non-recruiting duties that other assistant coaches did not have." Pl. Resp. Opp'n ¶ 6. However, Coach Richardson fails to demonstrate that such limitations were race-based. Coach Richardson was in charge of recruiting— that was his job. Def. Mem. Supp. ¶ 1. Other Assistant Coaches that were African American, such as Coach Stith, were not limited to recruiting duties. *See* Jones Dep. at 283:13–22.

Regarding Incident 4, in or about April 2016, Coach Jones hosted a Final Four Dinner. Pl. Resp. Opp'n ¶ C. At the dinner, Ms. Virga, a white woman who served as the Executive Director of the Old Dominion Athletic Foundation, said "f[*]ck you" to Coach Richardson in response to his joke criticizing her for supporting football at the expense of basketball. *Id.* (citing Brickman Decl. Ex. D at 202:18–204:01–25; Richardson Decl. ¶ 12); *see also* Def. Reply ¶ C, ECF No. 52. The Court has not been provided with any evidence that Ms. Virga's comment was based on Coach Richardson's race.

Turning to Incident 10, Coach Richardson states that Coach Jones placed Mr. Donohue on a PIP because he found Mr. Donohue to be disrespectful and rude at times to colleagues in the athletic department and office and to Coach Garvin. Pl. Resp. Opp'n ¶ V. This allegation does not mention race. The Court strains to understand how Mr. Donohue being placed on a PIP constituted unwelcome conduct based on Coach Richardson's race.

Finally, with respect to Incident 11, Coach Richardson states that Coach Jones considered Mr. Donohue's children as a reason for Mr. Donohue to not go recruit externally in the summer, but failed to give Coach Richardson the same consideration. *Id.* ¶ Z. The Court has reviewed the deposition testimony relied upon by Plaintiff in support of this statement, and once again, disagrees with his characterization. Coach Richardson had to go on the road, despite having children, because his primary role was recruitment of players. Brickman Decl. Ex. A at 267:09–268:13. The deposition provides that when Coach Jones was deciding whether to send Mr. Donohue or *Mr.*

*Lakey* on the road, he picked Mr. Lakey over Mr. Donohue because Mr. Donohue had kids. *Id.* Coach Richardson, who was in charge of recruitment duties, was going to be on the road regardless—it was not a decision between Coach Richardson and Mr. Donohue. The Court does not detect unwelcome conduct based on race.

In sum, while Coach Richardson may have taken issue with the aforementioned incidents, and with Coach Jones's handling of those incidents and related personnel decisions, no reasonable juror could find that Incidents 2, 4, 10, or 11 occurred *based upon* Coach Richardson's race. *See Fisher v. Maryland Dep't of Hous. & Cmty. Dev.*, 32 F. Supp. 2d 257, 262–63 (D. Md. 1998) (finding that "a few of the allegations . . . are inherently ambiguous and do not on their face reflect racially motivated discrimination.").

### c.    The Remaining Incidents are Not Sufficiently Severe or Pervasive

With respect to the remaining eight incidents—Incidents 1, 3, 5, 6, 7, 8, 9, and 12, even viewed collectively, the Court finds that they are not sufficiently severe or pervasive such that the conditions of Coach Richardson's employment were altered. The Court considers the remaining eight incidents in two buckets—(1) comments that were made to Mr. Richardson; and (2) other instances of unwelcome conduct.

### i.    Comments Made to Mr. Richardson

A "mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII. The same goes for simple teasing and offhand comments." *Boyer-Liberto*, 786 F.3d at 277 (citation modified). The Court finds the following four incidents to be teasing,

33

offhanded comments, or utterances which may have subjectively engendered offensive feelings for Coach Richardson, but do not rise to a level to implicate Title VII or § 1983: Incident 1: Coach Kovensky stated something to the effect of "Black Assistant Coaches are more effective than white assistant coaches at recruiting black players," Pl. Resp. Opp'n ¶ 6; Incident 3: Coach Jones likened Coach Richardson's communications with players to that of a "Black Southern Preacher," *id.* ¶ B; Incident 7: in response to Coach Richardson laughing at a skit performed by Black athletes, Mr. Kovensky said to an ODU Women's Basketball Assistant Coach, "look at John. What does he think this is, the CIAA?" *id.* ¶ K; and Incident 8: Coach Jones excused Coach Kovensky's racially offensive behavior by saying to Coach Richardson, "he is a middle aged white man and he ain't going to change," *id.* ¶ N.

"There is no doubt that [these comments are] offensive and suggestive of negative racial stereotypes . . . [however,] even taking both remarks together, Plaintiff's evidence does not meet the objective test for hostile work environment." *See Nicole v. Grafton Sch., Inc.*, 181 F. Supp. 2d 475, 484–85 (D. Md. 2002) (finding that employer's comments that plaintiff was the "kind of people you're supposed to spit on" and that the staff were "a bunch of African fools" were not sufficiently severe or frequent to establish a hostile work environment). Here, while the stereotypical and off-handed comments made to Coach Richardson are regrettable, Incidents 1, 3, 7, and 8 cannot be found to be sufficiently severe or pervasive to constitute a hostile work environment claim.

34

ii.     *Other Instances of Unwelcome Conduct*

The remaining incidents—Incidents 5, 6, 9, and 12—are also not sufficiently severe as a matter of law to demonstrate a hostile work environment. With respect to Incident 5, the requirement that Coach Stith and Coach Richardson attend a one-time two-day diversity training, while white coaches were not required to attend, cannot alone establish a racially hostile workplace. *See Young v. Colorado Dep't of Corr.*, 94 F.4th 1242, 1245 (10th Cir. 2024) ("[Plaintiff] does not allege that the training occurred more than once . . . [n]or does he allege any race-based harassing conduct, ridicule, or insult from either his co-workers or his supervisors within his workplace that occurred as a result of the training."). Similarly, as for Incident 6, Coach Jones's decision to only allow players to wear Equality t-shirts before fans entered the arena is regrettable, but does not constitute a hostile work environment. *See Williams v. Fam. Health Int'l*, No. 24cv2654, 2025 WL 2506580, at *11 (D.D.C. Sept. 2, 2025) (finding that a negative comment about the DEI program could not establish a hostile work environment claim). Regarding Incident 9, nor can the showing of a movie about slavery constitute severe racial discrimination. *See Dwyer v. Smith*, 867 F.2d 184, 187–89 (4th Cir. 1989) (affirming district court's dismissal of a sexual harassment claim where male squad members placed pornographic material in female police officer's station mailbox and engaged in sexually explicit conversations).

Finally, regarding Incident 12, Coach Jones's harsh comments to student athletes, a majority of whom are African American, also cannot form the basis for a hostile workplace environment claim. As an initial matter, while Coach Jones's

35

comments about the student athletes are objectively rude, Coach Richardson has not provided any evidence that such comments were race-based. Additionally, "comments referring to other individuals that were merely overhead by [the Plaintiff] are the sorts of offhanded comments and isolated incidents that the Supreme Court . . . . cautioned should not be considered severe or pervasive enough to constitute a hostile work environment." *Caver v. City of Trenton*, 420 F.3d 243, 263 (3d. Cir. 2005) (internal quotation marks and citation omitted). Therefore, the additional examples of unwelcome conduct highlighted by Coach Richardson—Incidents 5, 6, 9, and 12—are also not sufficiently severe or pervasive.

*   *   *

To be clear, the Court addresses these comments or incidents individually to provide comparisons with similar comments and incidents in analogous cases. However, even when viewed collectively, they do not rise to a sufficiently severe level. *See Mufti v. Aarsand & Co.*, 667 F. Supp. 2d 535, 545 (W.D. Pa. 2009) ("[I]n analyzing whether a plaintiff has established a prima facie case [of a hostile work environment], the court cannot confine its analysis to the individual pieces of evidence alone, but must view the record as a whole picture.") (internal quotation marks and citation omitted). While the Court in no way minimizes the above-described events, a comparison to Fourth Circuit cases in which a hostile work environment was found illustrates the distinction between those circumstances and Coach Richardson's claims. *See, e.g., Anderson v. G.D.C., Inc.*, 281 F.3d 452, 459 (4th Cir. 2002) ("Anderson was subjected, on a daily basis, to verbal assaults of the most vulgar and humiliating

36

sort."); *Conner v. Schrader-Bridgeport Int'l, Inc.*, 227 F.3d 179, 199 (4th Cir. 2000) ("Ms. Conner experienced regular, profound humiliation because of her gender, unlike the male machine operators."); *Amirmokri v. Balt. Gas & Elec. Co.*, 60 F.3d 1126, 1131 (4th Cir. 1995) ("[Amirmokri] testified that for six months . . . co-workers abused him almost daily, calling him names like 'the local terrorist,' a 'camel jockey' and 'the Emir of Waldorf.'"). Accordingly, no reasonable juror could conclude that Coach Richardson was subjected to a workplace so permeated with racial hostility that it altered the conditions of his employment.

### 4.    Disparate Impact

In order to establish a prima facie case of racial discrimination under either Title VII or § 1983, Coach Richardson must show: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action . . . ; and (4) that similarly-situated employees outside the protected class received more favorable treatment." *White v. BFI Waste Servs., Inc.*, 375 F.3d 288, 295 (4th Cir. 2004) (affirming district court's grant of summary judgment because appellants failed to provide evidence from which a reasonable jury could conclude that similarly-situated white employees received more favorable treatment).

### a.    Adverse Employment Actions Highlighted by Coach Richardson

In Coach Richardson's response in opposition to the instant Motion, he highlights eight instances which he alleges constitute adverse employment actions for the purposes of the disparate impact analysis: (1) Mr. Donohue had multiple meetings a year with Coach Jones and received feedback about his performance, whereas Coach

Richardson did not receive frequent constructive feedback about his performance from Coach Jones, Pl. Resp. Opp'n at 28 (citing *id.* ¶¶ AA–BB) ("Action 1"); (2) Mr. Wolff "mentored all the other assistants other than [Coach Richardson]," *id.* (citing *id.* ¶ DD) ("Action 2"); (3) Coach Richardson did not receive an offer of help with his job search once terminated, despite offers of help being made to Coach Kovensky and Mr. Donohue, *id.* (citing *id.* ¶ CC, EE) ("Action 3"); (4) Mr. Donohue engaged in an accusatory email exchange with Coach Garvin, who is black, and Mr. Donohue kept his job after this incident, *id.* (citing *id.* ¶¶ E–F, EE) ("Action 4"); (5) Coach Richardson and Coach Stith were required to attend a two-day race/diversity seminar; by contrast, white assistants were not required to attend the seminar, without consequence, *id.* (citing *id.* ¶¶ G–H) ("Action 5"); (6) Coach Jones excused Coach Kovensky's behavior by saying, "he is a middle-aged white man and he ain't going to change," *id.* (citing *id.* ¶ N) ("Action 6"); (7) Coach Richardson was never disciplined during his time at ODU, in comparison to Mr. Donohue, who was placed on a PIP; however, Mr. Donohue was not terminated for his behavior, *id.* (citing *id.* ¶¶ T–Y) ("Action 7"); and (8) Coach Jones considered Mr. Donohue's children as a reason for him to not go recruit externally in the summer, but failed to give that same consideration to Coach Richardson, *id.* (citing *id.* ¶ Z) ("Action 8").[10]

---

[10] Coach Richardson also cites Pl. Resp. Opp'n ¶ O as an example of disparate impact, which states, "ODU offered minimal training on discrimination and harassment." Pl. Resp. Opp'n ¶ O. As "minimal" training was presumably offered to all ODU staff, the Court cannot discern disparate impact and declines to consider that example herein.

### b.    *Comparator Examples*

The Court finds Actions 1, 3, 4, 6, 7, and 8 to be comparator examples, where Coach Richardson alleges that he was treated differently from Mr. Donohue and Coach Kovensky. In order to make a prima facie case of disparate impact, Coach Richardson must show not only that he suffered adverse employment actions that were not suffered by Mr. Donohue and Coach Kovensky, but that Mr. Donohue and Coach Kovensky were similarly-situated to him. *White*, 375 F.3d at 295. "Comparators need not be identical; rather, they must be similar in all *relevant* aspects, such as conduct, performance, and qualifications." *Emami v. Bolden*, 241 F. Supp. 3d 673, 680 (E.D. Va. 2017) (internal quotation marks and citation omitted); *see also Aljizzani v. Middle East Broad. Networks, Inc.*, No. 1:22cv1321, 2023 WL 5017969, at *3 (E.D. Va. Aug. 7, 2023) ("Factors rendering comparators similar include whether they dealt with the same supervisor, were subject to the same standards and engaged in the same conduct.") (citation modified).

Coach Richardson's deposition indicates that Mr. Donohue was a Special Assistant, Coach Kovensky was initially the Video Coordinator and later an Assistant Coach, and Coach Richardson was an Assistant Coach. Richardson Dep. at 109:10–17; 119:04–10. Mr. Donohue and Coach Kovensky's roles were different—they did not go out on the road and recruit as much as Coach Richardson. *Id.* at 283:13–23. Additionally, the record indicates that Mr. Donohue and Coach Kovensky were less experienced than Coach Richardson. *See* Jones Dep. at 255:18–256:17 ("Because of [Coach Donohue and Coach Kovensky's] relative inexperience . . . [they] were stuck" and

"weren't going to be able to . . . move."). Furthermore, although Coach Richardson takes issue with Mr. Donohue having multiple meetings with Coach Jones about his performance, the record indicates that Mr. Donohue's conduct was different than Coach Richardson's—in effect, Mr. Donohue needed feedback and mentorship whereas Coach Richardson largely did not. *See* Pl. Resp. Opp'n ¶ U (stating that Mr. Donohue was put on a PIP after the 2018–2019 season). Therefore, Coach Richardson has not met his prima facie case of demonstrating that Mr. Donohue and Coach Kovensky were similarly-situated comparators based on conduct, performance, or qualifications, and no reasonable juror could find a disparate impact claim based on the record with respect to Actions 1, 3, 4, 6, 7, and 8.

c.     <em>Other Examples</em>

The Court now turns to the remaining alleged instances of adverse employment actions based upon race—Actions 2 and 5. With respect to Action 2, Coach Richardson states that Mr. Wolff "mentored all the other assistants than [Coach Richardson.]" *Id.* ¶ DD. However, Mr. Wolff also mentored the other African-American coaches. Def. Reply Ex. 3 at 51:23–52:06, ECF No. 52-3. Therefore, Coach Richardson cannot show that employees outside the protected class received more favorable treatment with respect to Mr. Wolff's mentorship.

Finally, with respect to Action 5, the Court considers that Coach Richardson and Coach Stith were required to attend a two-day race/diversity seminar. Pl. Resp. Opp'n ¶ G. By contrast, white assistants were not required to attend the seminar, without consequence. *Id.* ¶ H. While denying an employee the opportunity to attend

40

a training may constitute an adverse employment action, "requiring an employee to attend training is not considered an adverse employment action." *Brown v. CSX Transp., Inc.*, 155 F. Supp. 3d 265, 271–72 (W.D.N.Y. 2016) (collecting cases comparing the denial of an opportunity to attend a training versus the requirement to attend a training). Moreover, Coach Richardson indicated that he benefitted from the training. *See* Richardson Dep. at 214:02–10; *Soloski v. Adams*, 600 F. Supp. 2d 1276, 1356 (N.D. Ga. 2009) (finding that requiring an employee to participate in sexual harassment training did not constitute an adverse employment action because it did not "impact the terms, conditions, or privileges of the plaintiff's job in a real and demonstrable way") (citing *Davis v. Town of Lake Park, Fla.* 245 F.3d 1232, 1239 (11th Cir. 2001)). Therefore, absent authority demonstrating that being required to attend a training constitutes an adverse employment action, the Court cannot discern a disparate impact—and Plaintiff provides no such authority. Therefore, no reasonable juror could find that Actions 2 or 5 constitute adverse employment actions based upon race.

*   *   *

As a final matter, though not necessary to the disparate impact analysis, the Court is further buoyed in its analysis by the fact that, every year after Coach Jones's arrival at ODU, Coach Richardson was the highest paid coach on the ODU Basketball team. Def. Mem. Supp. ¶ 5. Furthermore, Coach Stith and Mr. Wolff both testified that Coach Jones favored Coach Richardson, and let him get away with things that other assistant coaches could not. *Id.* at 14. Such facts fly in the face of the assertion

that Coach Richardson's white colleagues received more favorable treatment than him.

*      *      *

In conclusion, although Coach Richardson may have experienced some differences in treatment compared to other staff members, he has not established a prima facie case showing that such staff members were similarly situated to him, or that those differences in treatment constituted adverse employment actions. For the reasons stated above, Coach Richardson cannot demonstrate a disparate impact claim based on race.

*      *      *

For the foregoing reasons, no reasonable juror could find that Coach Richardson was discriminated against on the basis of his race—not based upon the failure to promote him, his termination, nor based upon the instances of unwelcome conduct or disparate impact that Coach Richardson highlighted. Therefore, Counts 1 and 2 of the Amended Complaint are **DISMISSED**.

### B.   State Law Claims: Fraudulent Inducement and Breach of Contract against ODU (Counts 3 and 4)

As the Court has found that Coach Richardson has not established a viable federal claim for racial discrimination pursuant to Title VII and § 1983, the Court declines to exercise jurisdiction over Coach Richardson's state-law claims alleging fraudulent inducement (Count 3) and breach of contract (Count 4). "Having found in favor of the defendant on the plaintiff's federal claim[], and considering the factors of convenience and fairness to the parties, existence of underlying issues of federal

42

policy and comity, and judicial economy, the court declines to exercise jurisdiction over [the] remaining state claims." *Coffey v. Morris*, 401 F. Supp. 2d 542, 548–49 (W.D. Va. 2005) (citing 28 U.S.C. § 1367(c)(3); *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995)); *see also Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 31–2 (2025) ("[A] district court may decline to exercise supplemental jurisdiction . . . if the district court has dismissed all claims over which it has original jurisdiction. In [this] context[], federal law is not where the real action is. So although supplemental jurisdiction persists, the district court need not exercise it: Instead, the court may (and indeed, ordinarily should) kick the case to state court.") (internal quotation marks and citation omitted). Coach Richardson's claims for fraudulent inducement (Count 3) and breach of contract (Count 4) under Virginia law are therefore **DISMISSED without prejudice.**

## IV.  CONCLUSION

For the foregoing reasons, the Motion (ECF No. 45) is **GRANTED**, the Richardson Motion (ECF No. 41) is **DISMISSED as moot**, and the Joint Motion (ECF No. 57) is **DISMISSED as moot**. Counts 1 and 2 of the Amended Complaint (ECF No. 22) are **DISMISSED with prejudice**. Counts 3 and 4 of the Amended Complaint (ECF No. 22) are **DISMISSED without prejudice**, with leave to file in state court.

43

The Clerk is **DIRECTED** to close the case. The Clerk is **REQUESTED** to forward a copy of this Order to counsel of record for all parties.

      **IT IS SO ORDERED.**

/s/

Arenda L. Wright Allen
United States District Judge

March 12, 2026
Norfolk, Virginia